# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# SHREVEPORT DIVISION

TDX ENERGY, LLC        *     CIVIL ACTION NO.  13-1242

VERSUS              *     MAG. JUDGE KAREN L. HAYES

CHESAPEAKE OPERATING, INC.     *

## MEMORANDUM RULING[1]

Before the court are two sets of cross-motions for partial or full summary judgment filed by TDX Energy, L.L.C.  ("TDX") [doc. #s 41 & 53] and Chesapeake Operating, Inc. ("Chesapeake") [doc. #s 44 & 45] in support of each party's respective positions on the issues raised by the complaint and the counterclaim.  For reasons detailed below, the court resolves the first set of motions in favor of defendant, Chesapeake, and the contested portion of the latter set in favor of defendant-in-counterclaim, TDX.

## Background

On May 23, 2013, TDX[2] filed the instant suit in diversity against Chesapeake[3] to recover production payments, accounting, penalties, and attorney's fees under Louisiana statutes that require the operator of an oil or gas well within a drilling unit to provide a detailed report to oil,

---

[1]  With the consent of all parties, the District Court referred this matter to the undersigned magistrate judge for the conduct of all further proceedings and the entry of judgment, 28 U.S.C. §  636(c). [doc. #s 37-38].

[2]  TDX is the holder of 21 oil, gas and mineral leases in DeSoto Parish.

[3]  Chesapeake is the operator of an actively producing well that encompasses TDX's leases.

gas and mineral owners in the unit with whom the operator has no lease.  (Compl. ¶ 1).  TDX

maintains that because Chesapeake:  1) did not have a lease over the lands at issue; *and* 2) failed

to provide TDX with requested reports within mandatory delays, then, pursuant to Louisiana

Revised Statute § 30:103.2, Chesapeake is obliged to pay TDX its share of well production

unencumbered by any adjustment or reduction for TDX's share of the well costs.  *Id*., ¶ 2.

Chesapeake contests TDX's right to relief under §§ 30:103.1 and 30:103.2.

On August 23, 2013, Chesapeake first advanced its argument(s) via a Rule 12(b)(6)

motion to dismiss for failure to state a claim upon which relief can be granted.  [doc. # 6].  On

September 10, 2013, TDX filed an opposition to Chesapeake's motion that also served as a Rule

56 motion for partial summary judgment.  [doc. # 13].  On September 27, 2013, Chesapeake

effectively supplemented its Rule 12(b)(6) motion to dismiss with an affidavit, which it

necessarily brought before the court as a cross-motion for summary judgment.  [doc. # 21].

In light of the cross-motions for summary judgment, the District Court denied the Rule

12(b)(6) motion as superfluous.  (March 28, 2013, Mem. Order [doc. # 27].  Thereafter, and in

due course, the District Court denied both of the cross-motions for summary judgment, without

prejudice to the parties' right to re-urge the motions once requisite discovery was completed.

(Jan. 14, 2015, Mem. Order [doc. # 28]).

On March 24, 2015, Chesapeake filed its answer to the complaint along with a

counterclaim seeking a declaration that, pursuant to Louisiana Revised Statute § 30:10, it is

entitled to own and recover out of production from the Unit, allocable to the tracts affected by

TDX's leases, such tracts' share of the actual, reasonable expenses incurred in drilling, testing,

completing, equipping, and operating the Unit Well, including a charge for supervision, together

with a risk charge equal to 200 percent of the tracts' share of the cost of drilling, testing, and completing the Unit Well.  (Ans. & Counterclaim, ¶¶ 17-18).

During an August 18, 2015, scheduling conference, the parties agreed that the case was postured for renewed dispositive motions.  (Minutes from Aug. 18, 2015, Sched. Conf. [doc. # 40]).  Accordingly, on September 5, 2015, TDX filed is (renewed) motion for partial summary judgment [doc. # 41] in which it adopted its submissions filed in connection with its earlier motion for partial summary judgment.  On September 25, 2015, Chesapeake re-urged its prior motion, via cross-motion for summary judgment [doc. # 44].  In addition, Chesapeake filed a separate motion for partial summary judgment [doc. # 45] in support of its counterclaim.  On October 31, 2015, TDX filed a cross-motion for partial summary judgment contesting Chesapeake's right to collect a risk fee under Louisiana Revised Statute § 30:10.  [doc. # 53].  Following delays for further briefing, the matter is ripe.

## Summary Judgment Principles

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

3

any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247).  "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.*

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor.  *Anderson*, 477 U.S. at 255.  While courts will "resolve factual controversies in favor of the non-moving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  There can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322-323.  The non-moving party may not rely merely on the allegations and conclusions contained within the pleadings; rather, the non-movant "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial."  *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).  The non-movant does not satisfy his burden merely by demonstrating some metaphysical doubt as to the material facts, by setting forth conclusory allegations and unsubstantiated assertions, or by presenting but a scintilla of evidence.  *Little*, 37 F.3d at 1075 (citations omitted).

Moreover, "summary judgment is appropriate in *any* case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" *Little, supra* (citation omitted) (emphasis in original).  In sum, "[a]fter the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000) (citation omitted).

When a movant bears the burden of proof on an issue, it must establish "beyond [doubt] all of the essential elements of the claim . . . to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  In other words, the movant must affirmatively establish its right to prevail as a matter of law.  *Universal Sav. Ass'n v. McConnell*, 1993 WL 560271 (5th Cir. Dec. 29, 1993) (unpubl.).

## Pertinent Facts

The facts are straightforward and essentially undisputed:

1.  By Order 1199-E, the Louisiana Office of Conservation created the unit designated as "HA RA SUH" affecting Section 14, Township 11 North, Range 13 West, DeSoto Parish, Louisiana (the "Unit").  The Order was dated September 29, 2008 and was made effective on September 16, 2008.  (James Clark Affidavit; Chesapeake MPSJ, Exh. 1 [doc #45]).

2.  The HA RA SUH; CHK LA MIN 14-11-13 H No. 1 Well (Serial No. 242605) (the "Well") is the unit well for the Unit.  *Id*. Chesapeake is the operator of the Unit.  *Id*.

3.  The Well was spud on February 5, 2011, and was completed as a producer on July 19, 2011.  *Id*.

4.  Between July 18, 2011 and September 14, 2011, Touchstone Energy LLC ("Touchstone") obtained twenty-one "Oil, Gas and Mineral Lease[s]," (the "Subject Leases") covering approximately 62.5196 net acres located within the Unit.  (David Briggs Affidavit, Exh. A; TDX Opp Memo., Exh. 1 [doc. # 52].  All of the Subject Leases were dated July 15, 2011, and recorded with the DeSoto Parish Clerk of Court between July 22 and September 14, 2011.  *Id*.

5.      On October 25, 2011, with an effective date retroactive to September 14, 2011, Touchstone transferred all of its right, title, and interest in the Subject Leases to TDX. *Id.*

6.      On December 5, 2011, TDX first notified Chesapeake that it had acquired an interest in the Well, pursuant to the Subject Leases that it had obtained from Touchstone.  (Dec. 5, 2011, Letter from TDX to Chesapeake; Clark Affidavit, Exh. A).  TDX asked Chesapeake to provide it with a full and complete report on the Well in accordance with Louisiana Revised Statute § 30:103.1.  *Id.*

7.      On January 18, 2012, TDX sent another letter to Chesapeake to "call attention to [its] failure to comply with the provisions of La. R.S. 30:103.1."  (Jan. 18, 2012, Letter from TDX to Chesapeake; Verified Compl., Ex. D).

8.      In a January 23, 2012, letter, Chesapeake provided TDX with its costs to drill the Well.  (Clark Affidavit, Exh. B [doc # 45]).  Chesapeake further explained that, pursuant to Louisiana Revised Statute § 30:10, TDX, as an owner, had 30 days from the date of the notice to elect to participate in the risk and expense of the well.  *Id.*  Chesapeake cautioned that TDX's failure to timely provide notice of an election would be deemed an election not to participate.  *Id.*

9.      One month later, TDX replied to Chesapeake's correspondence, via letter dated February 22, 2012, in which it took issue with the sufficiency of Chesapeake's January 23, 2012, letter insofar as it sought to invoke the provisions of  Louisiana Revised Statute § 30:10.  (Briggs Affidavit, Exh. B [doc #52-1]).  TDX specifically explained that the letter was untimely and that it failed "to provide all of the information required to be provided under La. R.S. 30:10."  *Id.*

10.     On February 27, 2012, TDX again wrote to Chesapeake to advise the company that because of Chesapeake's 90-plus day failure to comply with the provisions of Louisiana Revised Statute § 30:103.1, Chesapeake had forfeited its right to demand contribution from TDX for well costs.  (Feb. 27, 2012, Letter from TDX to Chesapeake; Verified Compl., Ex. E).

## **Applicable Law and Legal Principles**

Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211(1996); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817 (1938).  The parties in this matter implicitly agree that the disputed issues are governed by the substantive law

of Louisiana.[4]  *See In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 206 (5th Cir. 2007)

(deferring to the parties' agreement that Louisiana substantive law controlled); *Ace American*

*Insurance Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832 (5th Cir. 2012) (applied

Texas law where neither side disputed that Texas law applied); *Jefferson v. Lead Indus. Ass'n*,

106 F.3d 1245, 1250 (5th Cir. La. 1997) (applied Louisiana law where no party disputed that

Louisiana law governed).

To determine Louisiana law, federal courts look to the final decisions of the Louisiana

Supreme Court.  *Moore v. State Farm Fire & Casualty Co.*, 556 F.3d 264, 269 (5th Cir. 2009)

(citation omitted).  In the absence of a decision by the Louisiana Supreme Court on a given

issue, federal courts are compelled to make an *Erie* guess.  *In re Katrina Canal Breaches*

*Litigation*, 495 F.3d at 206; *Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 628 (5th Cir. 2000).  In

so doing, the court must use its best judgment to determine

> how [the Louisiana Supreme C]ourt would resolve the issue if presented with the
> same case.  In making an *Erie* guess, we must employ Louisiana's civilian
> methodology, whereby we first examine primary sources of law:  the constitution,
> codes, and statutes.  Jurisprudence, even when it rises to the level of
> *jurisprudence constante*, is a secondary law source in Louisiana.  Thus, although
> we will not disregard the decisions of Louisiana's intermediate courts unless we
> are convinced that the Louisiana Supreme Court would decide otherwise, we are
> not strictly bound by them.

*In re Katrina Canal Breaches Litigation*, 495 F.3d at 206 (internal citations and quotation marks
omitted).

In Louisiana, "the starting point for the interpretation of any statute is the language of the

statute itself,"[5] to which the court applies the following principles,

---

[4]  Both sides analyzed the claims pursuant to Louisiana law.

[5]  *Palmer v. Louisiana State Bd. of Elementary & Secondary Educ.*,  842 So.2d 363, 368
(La. 2003) (citations omitted).

When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.  La. Civ. Code Art. 9.

When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. La. Civ. Code Art. 10.

The words of a law must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the law involves a technical matter.  La. Civ. Code Art. 11.

When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole.  La. Civ. Code Art. 12.

Laws on the same subject matter must be interpreted in reference to each other. La. Civ. Code Art. 13.

When no rule for a particular situation can be derived from legislation or custom, the court is bound to proceed according to equity. To decide equitably, resort is made to justice, reason, and prevailing usages.  La. Civ. Code Art. 4.

Furthermore, "[l]egislation is a solemn expression of legislative will."  La. Civ. Code Art. 2.  Consequently, the interpretation of legislation is primarily the search for legislative intent.  *In re Succession of Boyter*, 756 So.2d 1122, 1128 (La. 2000) (citations omitted).  Courts should give effect "to all parts of a statute and should not give a statute an interpretation that makes any part superfluous or meaningless, if that result can be avoided."  *Id*.  Finally, "where a literal interpretation would produce absurd consequences, the letter must give way to the spirit of the law and the statute construed so as to produce a reasonable result."  *Palmer, supra* (citations omitted).

_____

Rules of statutory construction are substantive; therefore, the court applies Louisiana law to resolve the statutory interpretation disputes at issue herein.  *See Engines Sw., Inc. v. Kohler Co.*, 371 F. Supp.2d 830, 834 (W.D. La.2005) (Hicks, J.).

## Analysis

The parties' two sets of summary judgment motions address countervailing interpretations of two provisions of the Louisiana Mineral Code.  The court will address each disputed provision, in turn.

**I.      TDX's Complaint:  Louisiana Revised Statutes §§ 30:103.1 and 30:103.2**

a)      Statutory Interpretation

The issue presented by TDX's complaint is whether, pursuant to Louisiana Revised Statutes §§ 30:103.1 and 30:103.2, TDX (as owner of certain oil, gas, and mineral leases within a drilling unit that are not under lease to the unit operator, Chesapeake) is entitled to receive certain well information from the unit operator, and thereafter, be absolved of responsibility for its share of the unit well costs when, as here, the unit operator fails to provide the mineral leaseholder with the requisite reports, after notice(s).[6]

The foregoing notwithstanding, Chesapeake contends that TDX is not afforded a remedy under §§ 30:103.1 and 30:103.2 because TDX is not the "owner or owners of *unleased* oil and gas interests."  (emphasis added).  Chesapeake emphasizes that the affected land is *not* unleased, rather it *is* subject to an oil, gas, or mineral lease – obtained by TDX.  In response, TDX contends that the phrase "owner or owners of unleased oil and gas interests" is a shorthand method of referring to the owner of oil and gas interests within a unit that are unleased by the

---

[6]      For purposes of the pending motions, it is uncontested that Chesapeake is the unit operator and that TDX is the owner of certain mineral leases covering land within the Unit upon which Chesapeake has no oil, gas, or mineral lease.  In addition, TDX sent Chesapeake a certified letter requesting a full and complete report on the well, to which Chesapeake failed to provide fully responsive information, despite its receipt of notice of noncompliance, sent via certified mail.

*unit operator*, i.e., Chesapeake.

The court begins its analysis with the specific statutory provision that provides the grounds for TDX's contention that Chesapeake forfeited its right to recover well costs:

> [w]henever the operator or producer permits ninety calendar days to elapse from completion of the well and thirty additional calendar days to elapse from date of receipt of written notice by certified mail from the **owner or owners of unleased oil and gas interests** calling attention to failure to comply with the provisions of R.S. 30:103.1, such operator or producer shall forfeit his right to demand contribution from the **owner or owners of the unleased oil and gas interests** for the costs of the drilling operations of the well.

La. R. S. § 30:103.2 (emphasis added).

A reading of this provision in isolation favors Chesapeake's argument that "unleased" refers to oil and gas interests that are not leased at all. If the legislature had intended the statute to benefit "owners of oil and gas interests *unleased by the operator*," it should have so stated. This interpretation is buttressed by the maxim that "statutes which authorize the imposition of a penalty are to be strictly construed." *Gibbs Const. Co., Inc. v. State, Dep't of Labor*, 540 So.2d 268, 269 (La. 1989). Courts have recognized that § 30:103.2 is a penal statute that must be strictly construed. *Scurlock Oil Co. v. Getty Oil Co.*, 324 So.2d 870, 876 (La. App. 3rd Cir. 1975) (citations omitted); *see also Adams v. Chesapeake Operating, Inc.*, 561 Fed. Appx. 322, 325 (5th Cir.2014) (recognizing that § 103.2 imposes a penalty).[7]

---

[7] Other case law does not affect the court's reading of the statute. In *Scurlock Oil Co. v. Getty Oil Co.* and *Genmar Oil & Gas, Inc. v. Storm*, Louisiana intermediate courts did not question a mineral lessee's standing to invoke § 103.2's penalty provision, and instead, denied relief to the lessees on other grounds. *See Scurlock Oil Co.*, *supra*; *Genmar Oil & Gas, Inc. v. Storm*, 297 So.2d 722 (La. App. 4th Cir. 1974) *writ granted*, 302 So.2d 13, *action dismissed* 309 So.2d 657 (La.1975). However, in the absence of any discussion or analysis by these intermediate courts, the undersigned cannot attribute any weight to the courts' tacit assumption that § 103.2 may be invoked by the holder of a mineral lease on unit lands upon which the operator does not enjoy a lease.

As the parties also noted, two Louisiana trial courts have reached contrasting outcomes

10

Accordingly, the court finds that § 30:103.2 is clear and unambiguous, as written.

Moreover, limiting § 30:103.2's penalty provision solely to unit lands unencumbered by *any* mineral leases does not lead to absurd consequences.  The legislature well may have intended to provide greater protections for land owners who typically are not as sophisticated as, or have the available resources of, individuals or entities that procure mineral leases.  *See* discussion, *infra*.

Even if the phrase, "owner or owners of unleased oil and gas interests"*were* susceptible of different meanings, and thereby ambiguous, the law must be interpreted as having the meaning that best conforms to the purpose of the law.

In *Scurlock Oil Co. v. Getty Oil Co.*, the Louisiana court of appeal recognized that

> the purpose of LSA-R.S. 30:103.1 and 103.2 obviously was to provide a procedure by which the owner of unleased lands in a drilling or production unit could have the amount of drilling costs fixed, so that the remaining proceeds of the sale of production could be released and he could obtain his proportionate part of those proceeds without too great a delay.

*Scurlock Oil Co.*, 324 So.2d at 876.

In *Brannon Properties, LLC v. Chesapeake Operating, Inc.*, however, the United States Fifth Circuit threw cold water on *Scurlock Oil Co.*'s attempt to divine the legislative intent behind §§ 30:103.1 and 103.2.  *Brannon Properties, LLC v. Chesapeake Operating, Inc.*, 514 Fed. Appx.

---

regarding the applicability of §§ 30:103.1 and 30:103.2 under analogous facts.  *See XXI Oil & Gas, LLC v. Hilcorp Energy Co.*, No. 2011-5292 (15th JDC Jan. 6, 2012) (Written Reasons for Judgment) [doc. # 25-1] and *Kash Oil & Gas, Inc. v. Texas Petroleum Investment Co.*, No. 90,947-G (15th JDC Dec. 23, 2009) (Judg. on Exceptions) [doc. # 26-4].  However, the district courts provided no rationale to support their decisions, and the court of appeal denied writs, without discussion.  *XXI Oil & Gas, LLC v. Hilcorp Energy Co.*, No. CW 12-00154 (La. App. 3d Cir. Apr. 17, 2012) [doc. # 25-2]; and *Kash Oil & Gas, Inc. v. Texas Petroleum Investment Co.*, No. CW 10-00079 (La. App. 3d Cir. Apr. 22, 2010) [doc. # 26-4].  Secondary authorities are similarly divided and equally bereft of analysis.  *Compare* Blaise Sonnier, *Accounting for Well Costs and Well Cost Adjustments in Louisiana*, 55 Loy. L. Rev. 79 (2009)) and Affidavit of Patrick Martin, dated Sept. 17, 2013 [doc,. # 20-1].

459, 462 (5th Cir.2013).  The court explained that § 30:103.1's "itemization requirement strongly suggests that the Louisiana legislature intended the statute to do more than simply notify the unleased mineral owner of the drilling costs."  *Id*.  Further, in the absence of any evidence to establish § 30:103.1's additional purpose, the court was at a loss to apply the statute in conformity with any speculative purpose.  *Id*.

Although the parties in the case *sub judice* have not provided any *evidence* of legislative intent (such as committee hearing transcripts or the like), it is manifest that "[t]he text of a law is the best evidence of legislative intent."  *In re Tillman*, 2016 WL 1051618 ___ So. 3d ____ (La. March 15, 2016) (citing La. R.S. 24:177(B)(1)).  Finding scant expressions of legislative intent within the narrow confines § 30:103.2, however, the court necessarily expands its search to § 30:103.1's introductory paragraph, which provides that

> [w]henever there is included within a drilling unit . . . **lands producing oil or gas, or both, upon which the operator or producer has no valid oil, gas, or mineral lease**, said operator or producer shall issue the following reports to the **owners of said interests** by a sworn, detailed, itemized statement . . .

La. R. S. § 30:103.1(A) (emphasis added).

Stated differently, whenever an operator/producer has not procured a valid oil, gas, or mineral lease over oil or gas producing lands located within the unit, then the operator/producer must issue specified reports to the "owners of said interests."  This begs the question, owners of which interests?  Section 30:103.1's remaining paragraphs suggest that it is the "owner(s) of the unleased interest," and/or the "owner(s) of an unleased oil or gas interest,"[8] which, of course,

---

[8]  These paragraphs provide:

B. No operator or producer shall be required under the provisions of this Section to report any information which is not known by such operator or producer at the time of a report. However, the operator or producer shall report the required

returns us full circle to § 30:103.2's perpetuation of the phrase.

Having failed to discern legislative intent within the texts of §§  30:103.1 and 103.2, the

court is compelled to seek succor further afield in a statute enacted the same year as §§  30:103.1

and 103.2, albeit via separate act:

> **[o]wners of unleased mineral interests and lessees in any drilling unit**
> authorized by the department of conservation of this state, shall not be liable or
> obligated to pay to the operator or producer for materials furnished or used in the
> drilling, completion, and production of any oil, gas, or mineral well drilled on
> said unit a sum in excess of the prevailing market price of such materials.

La. R. S. § 30:111 (emphasis added).

By adding "lessees" to "owners of unleased mineral interests," § 30:111 clarifies the legislature's

understanding that the latter phrase refers to owners of mineral interests unleased *by anyone*.

Otherwise, the statute's inclusion of "lessees," would be rendered superfluous and meaningless

– an outcome that the courts are tasked with avoiding whenever possible.

---

> information to the **owner of the unleased interest** within thirty days after such
> information is obtained by the operator or producer, or in the next quarterly
> report, whichever due date is later.
>
> C. Reports shall be sent by certified mail to each **owner of an unleased oil or gas
> interest** who has requested such reports in writing, by certified mail addressed to
> the operator or producer. The written request shall contain the unleased interest
> owner's name and address. Initial reports shall be sent no later than ninety
> calendar days after the completion of the well. The operator or producer shall
> begin sending quarterly reports within ninety calendar days after receiving the
> written request, whichever is later, and shall continue sending quarterly reports
> until cessation of production.
>
> D. Notwithstanding any other provision of this Section to the contrary, at the time
> a report is due pursuant to this Section, if the share of the total costs of drilling,
> completing, and equipping the unit well and all other unit costs allocable to an
> **owner of an unleased interest** is less than one thousand dollars, no report shall
> be required. However, during January of the next calendar year, the operator or
> producer shall report such costs to the owner.

La. R. S. § 30:103.1(B)-(D) (emphasis added).

The court also notes that Louisiana Revised Statute § 30:10, albeit situated in a separate chapter within Title 30, includes a section stating that, "[t]he provisions . . . above with respect to the risk charge shall not apply to any **unleased interest not subject to an oil gas, and mineral lease . . .** La. R.S. § 30:10(A)(2)(e) (2011).  This provision suggests that "unleased interest" means a mineral interest not leased by the operator/producer because the statute further specifies that the interest is not subject to any other mineral lease.

However, § 30:10's risk charge provisions were enacted some 30 years after §§ 103.1 and 103.2.[9]  Therefore, the legislature likely included the clarifying clause to avoid the same ambiguity argument that is presently plaguing §§ 103.1 and 103.2.  Thus, rather than detracting from the court's reading of §§ 103.1 and 103.2, § 30:10(A)(2)(e) demonstrates that, at least in some instances, the legislature intended to confer greater protection to unleased owners than mineral lessees.  *See also King v. Strohe*, 673 So.2d 1329 (La. App. 3d Cir. 1996).[10]

In sum, TDX is not entitled to relief under §§ 30:103.1 and 30:103.2.

b)      Constitutionality[11]

---

[9]  *See* Guy E. Wall, *Joint Oil and Gas Operations in Louisiana*, 53 La. L. Rev. 79, 90 (1992).

[10]  TDX suggests that without a remedy under §§ 30:103.1 and 30:103.2, it cannot compel Chesapeake to disclose well cost and production information.  At minimum, however, TDX is entitled to its share of production from Chesapeake, minus its share of the well costs. *See King, supra*; La. R.S. § 30:10(A)(2)(b)(iii) (2012).  In so doing, Chesapeake will have to provide TDX with well cost and production information.  Furthermore, if TDX disputes the calculation of unit well costs, then it may petition the Commissioner for relief.  La. R.S. § 30:10(A)(2)(f) (2012).

[11]  Having credited Chesapeake's argument that TDX is not entitled to relief under §§ 30:103.1 and 30:103.2, the court need not reach Chesapeake's alternative argument.  However, because a higher court may take a different approach to §§ 30:103.1 and 30:103.2, the undersigned briefly pauses to address Chesapeake's constitutionality argument.

14

Chesapeake contends that the 2001 amendment to §§ 30:103.1 and 30:103.2 violates the one object clause of the Louisiana Constitution because the title of the 2001 act referred only to "owners of unleased mineral interests," rather than owners of a mineral lease unleased by the unit operator.  *See* Chesapeake Memo., pg. 12 [doc. # 6]; La. Const. Art. III, § 15(A).

The Louisiana Supreme Court has emphasized, in this regard, that

[i]n deciding whether a statute of the Legislature violates a constitutional provision which prohibits an act from embracing more than one object, courts must keep in mind its main purpose as disclosed by its language. It matters not how comprehensive the act may be or how numerous its provisions; it does not violate such a constitutional prohibition if its language, reasonably construed, shows that it has but one main, general object or purpose, and if nothing is written into it except what is naturally connected with, and is incidental or germane to, the one purpose or object.

*Wall v. Close*, 203 La. 345, 365, 14 So.2d 19, 26 (1943).

Consequently,

the constitution does not prohibit the legislature from addressing several branches of one subject or from providing in one bill the necessary means for carrying out its object. As long as the parts of a bill are reasonably related and have a natural connection to the general subject matter of the legislation, the bill is considered to have one  object.

*Louisiana Fed'n of Teachers v. State*, 118 So.3d 1033, 1064-65 (La. 2013) (citations omitted).

Here, it is manifest that the phrase "owners of unleased mineral interests," or its equivalent, is perpetuated throughout both statutes.  While the parties may dispute the meaning of the phrase, the legislature faithfully employed the same or similar version of the phrase in the text of the statute and the title of the act.  The statutes did not transgress the constitution.

## II.    Chesapeake's Counterclaim:  La. R.S. § 30:10

Chesapeake's motion for partial summary judgment seeks a declaration that, pursuant to Louisiana Revised Statute 30:10, it is entitled to own and recover out of production from the Unit Well:  1)  TDX's allocated share of the actual reasonable expenditures incurred in drilling,

15

testing, completing, equipping, and operating the Unit Well, including a charge for supervision, plus 2) a risk charge, equal to two hundred (200%) percent of TDX's allocated share of the cost of drilling, testing, and completing the Unit Well.  (M/P. S. Judg. [doc. # 45]).

a)      Well Costs

According to Chesapeake, there is no dispute that it is entitled to relief on the first component of its claim for declaratory relief.  Moreover, aside from its unsuccessful argument urged pursuant to § 30:103.2 addressed in Section I, *supra*, TDX's memoranda do not contest that it is responsible for its share of the costs of drilling, completing, equipping, and operating the Unit Well, including a charge for supervision.  *See* La. R.S. 30:10(A)(2)(b)(ii) (2011).[12] Indeed, TDX's motion seeks partial summary judgment solely as to Chesapeake's right to a risk fee under Louisiana Revised Statute § 30:10.

Accordingly, the court finds that Chesapeake is entitled to own and recover out of production from the Unit Well TDX's allocated share of the actual reasonable expenditures incurred in drilling, testing, completing, equipping, and operating the Unit Well, including a charge for supervision.

b)      The Risk Fee

Historically, non-operating owners in a unit were inclined to sit back and wait until after a well was drilled before electing whether to participate in the cost, risk, and expense of drilling

---

[12]   The section provides that,

[a]ny owner not notified shall bear only his tract's allocated share of the actual reasonable expenditures incurred in drilling, testing, completing, equipping, and operating the unit well, including a charge for supervision, which share shall be subject to the same obligation and remedies and rights to own and recover out of production in favor of the drilling party or parties as herein provided.

*Id*.

16

the well. Consequently, the operator unilaterally shouldered the risk of the well being dry or

uneconomical.  To redress this inequity, in 1985 the legislature enacted the risk fee provision to

permit a drilling owner to require all other lease owners in the unit to pay their share of the costs

or suffer a risk charge.  *See* Guy E. Wall, *Joint Oil and Gas Operations in Louisiana*, 53 La. L.

Rev. 79, 90 (1992).  Thus, if the unit well proved to be a successful commercial producer, then

the non-operator is entitled to its share of well production, but only after the operator recoups the

non-operator's share of drilling expenses, plus a "risk fee" to compensate the driller for having

assumed the risk of having to bear the entire cost of drilling the well if it turned out to be a non-

producer.

Importantly, however, and as discussed in connection with TDX's claim under 30:103.1

and 30:103.2, *supra*, the risk charge does not apply "to any unleased interest not subject to an oil

gas, and mineral lease . . ."  La. R.S. § 30:10(A)(2)(e) (2011).  Thus, so long as the unit lands are

not encumbered by any oil, gas, and mineral lease, then the unit operator cannot recover a risk

fee.

Here, aside from two leases obtained on July 18 and 19, 2011, the remaining 19 subject

leases were signed after the Well was completed on July 19, 2011.  All of the subject leases were

dated retroactively to July 15, 2011; none, however, were recorded with the Clerk of Court

before July 22, 2011.  Of course, "[a]lthough the lease may have retroactive effects between the

parties to it, the document is a nullity with respect to third parties until recordation."  *King*, 673

So.2d at 1340 (citation omitted); *see also* La. Civ. Code Art. 1839.  In short, until such time as

the subject leases were recorded, the affected land remained unleased as to third-parties,

including Chesapeake, thereby precluding Chesapeake from assessing a risk fee from the

landowners.  *King, supra.*

Nevertheless, Chesapeake contends that it was permitted to subject TDX to the risk fee by providing TDX notice in January 2012, more than 30 days after TDX first notified Chesapeake that it was a leaseholder, and more than six months after the unit well was completed.  Louisiana Revised Statute 30:10A(2)(a)(i)[13] specifies the manner in which an operator is to provide notice to other owners for purposes of invoking the risk fee provision:

> [a]ny owner **drilling or intending to drill** a unit well, including a substitute unit well, on any drilling unit heretofore or hereafter created by the commissioner, may, by certified mail, return receipt requested, notify all other owners in the unit of the drilling or **the intent to drill** and give each owner an opportunity to elect to participate in the risk and expense of such well.  Such notice shall contain:
>
> (aa) An **estimate** of the cost of drilling, testing, completing, and equipping the unit well;
>
> (bb) The **proposed** location of the unit well;
>
> (cc) The **proposed** objective depth of the unit well; and
>
> (dd) All logs, core analysis, **production data**, and well test data from the unit well which has not been made public.

La. R.S. § 30:10A(2)(a)(i) (2011-2012) (emphasis added).

Chesapeake argues that it provided the foregoing information to TDX, and that TDX failed to elect to participate within 30 days after TDX's receipt of written notice.  Therefore, TDX was deemed a non-participating owner, and became subject to the risk charge equal to two hundred percent of the tract's allocated share of the cost of drilling, testing, and completing the unit well.  *See* La. R.S. §§ 30:10A(2)(a)(ii) and 30:10A(2)(b)(i).

TDX advances two interrelated reasons why it is not subject to the risk fee:  1) the §

---

[13]  Along with the parties, the court references the pre-August 1, 2012, version of the statute.

30:10A(2)(a)(i) notice that Chesapeake provided to TDX was ineffective because it was not sent prior to completion of the well; and 2) TDX received the benefit of its lessors' status as unleased owners (as to Chesapeake), which had vested by the time the leases were recorded.[14]

The court agrees with TDX that § 30:10A(2)(a)(i) includes a temporal boundary because it permits "[a]ny owner *drilling or intending to drill* a unit well . . ." to notify other owners of the "*intent to drill* . . ."  It is manifest that § 30:10A(2)(a)(i) does not apply to wells already completed.  To the extent that there is any ambiguity, the statute's use of the present and future tenses clearly evidences legislative intent that the notice provision does not apply to completed wells.  *See State v. Flagg*, 815 So.2d 208, 214 (La. App. 5th Cir. 2002) (present tense verb is evidence of legislative intent); *Carr v. United States*, 560 U.S. 438, 448-49, 130 S.Ct. 2229, 2236 (2010) (Court frequently looks to Congress' choice of verb tense to ascertain a statute's temporal reach).  Indeed, § 30:10 expressly provides two exceptions that extend the notice, election, and participation provisions to a completed well "as if a unit well were being proposed" by the drilling owner – neither of which are applicable here. La. R.S. §§ 30:10A(2)(c) & (d)(i).[15]

---

[14]  TDX also argues 1) that Chesapeake's notice was invalid because it failed to provide all of the necessary information, and 2) that § 30:103.2 precluded Chesapeake from collecting a risk fee.  The court has rejected the premise for the latter argument.  *See* Section I, *supra*.  Moreover, the former contention is contingent on TDX's untimeliness argument.  If, as Chesapeake contends, it is permitted to provide notice of the election to participate in the well at any time after completion of the unit well, then Chesapeake also should be able to cure any present deficiencies in the notice via supplemental notice.

[15]  Chesapeake argues that a secondary authority supports its interpretation because the author recognized that under § 30:10 "an owner who *has drilled a unit well* or intends to drill a unit well may require all the other lease owners in the unit to pay their share of the costs or suffer a risk charge . . ." Guy E. Wall, *Joint Oil and Gas Operations in Louisiana*, 53 La. L. Rev. 79, 90 (1992) (emphasis added).  This comment is unremarkable, however, because the statute plainly *does* authorize post-completion notice under two limited circumstances.  Unfortunately for Chesapeake those two circumstances are not present here.

However, those limited exceptions are inapplicable here.

Chesapeake also contends that other sections of § 30:10 establish that the legislature intended for notice to sent after the well was completed.  For instance, Chesapeake emphasizes that limiting the notice provision of § 30:10A(2)(a)(i) to wells that are not yet completed would render § 30:10A(2)(a)(i)(dd) (pre-2012 version)'s requirement that the operator disclose production data meaningless because production data is not available until after the well is completed and producing.  Again, however, because § 30:10 authorizes post-well completion notice in two limited circumstances, production data *will* be available in those instances.

Finally, Chesapeake invokes equity and reason in a bid to persuade the court to re-write the statute to do justice in conformity with the spirit of the law.  Chesapeake contends that TDX should not be permitted to "game the system" by waiting until after the well is completed before recording its leases, and thereby avoiding the risk fee.  Chesapeake notes that TDX actually is in a better position than if it had been compelled to decide whether to participate in the well *before* completion.

In support, Chesapeake cites *Bonn Operating Co. v. Devon Energy Prod. Co., L.P.*, where the Fifth Circuit applied Texas law, including waiver, to reform the terms of the parties' contract.  *Bonn Operating Co. v. Devon Energy Prod. Co., L.P.*, 613 F.3d 532, 536 (5th Cir.2010).  Here, in contrast, the source of the risk fee obligation is statutory, not contractual, and principles of waiver are inapplicable.  Chesapeake is asking the court to amend a clearly worded statute to redress what it contends is a loophole in the law.  All sides agree, however, that the legislature expressly excluded "any unleased interest not subject to an oil, gas, and

mineral lease" from the risk fee.  Thus, at the time it drilled the well, Chesapeake could not have

expected to collect the risk fee from the interests now covered by the subject leases.  Although

after the well was completed the status of the interests changed from unleased to leased (as to

Chesapeake), the statute does not recognize this eventuality as one of the limited instances where

the notice period is re-opened.  Application of the statute, as written, does not lead to absurd

results.

In the end, the court appreciates Chesapeake's policy arguments, but it simply is not

authorized to re-write the risk fee provision in Chesapeake's favor; instead, that prerogative

remains within the legislature's exclusive domain.[16]  *Lewis v. City of Chicago, Ill.*, 560 U.S. 205,

215, 130 S.Ct. 2191, 2200 (2010) (it is not for the court to rewrite the statute to achieve what the

courts think Congress intended); *Artuz v. Bennett*, 531 U.S. 4, 10, 121 S.Ct. 361, 365 (2000)

("Whatever merits these and other policy arguments may have, it is not the province of this

Court to rewrite the statute to accommodate them.").

## Conclusion

For the above-assigned reasons, the court finds, pursuant to Rule 56 of the Federal Rules

of Civil Procedure, that there is no genuine dispute of material fact and that judgment as a matter

of law is warranted, as follows,

IT IS ORDERED that TDX's renewed motion for partial summary judgment [doc. # 41]

---

[16]  In 2012, rather than expand the risk fee's notice provision, the legislature amended §
10:30 to require the drilling owner to notify other owners in the unit "prior to the actual spudding
of any such well . . ."  La. R.S. § 30:10A(2)(a)(i) (2012).  "Spudding" is the commencement of
the initial drilling of a well.  *See Falcon Petroleum v. Fed. Energy Regulatory Comm'n*, 642 F.2d
780, 782 (5th Cir.1981) (Unit A).

is DENIED.

IT IS FURTHER ORDERED that Chesapeake's renewed motion for cross-summary judgment [doc. # 44] is GRANTED, DISMISSING WITH PREJUDICE TDX's claims, in their entirety.

IT IS FURTHER ORDERED that TDX's cross-motion for partial summary judgment [doc. # 53] is GRANTED, DISMISSING WITH PREJUDICE Chesapeake's counterclaim for a risk fee.

IT IS FURTHER ORDERED that Chesapeake's motion for partial summary judgment [doc. # 45] is GRANTED-IN-PART, declaring that Chesapeake is entitled to own and recover out of production from the Unit Well TDX's allocated share of the actual reasonable expenditures incurred in drilling, testing, completing, equipping, and operating the Unit Well, including a charge for supervision.

IT IS FURTHER ORDERED that Chesapeake's motion for partial summary judgment [doc. # 45] otherwise is DENIED.

In Chambers, at Monroe, Louisiana, this 24th day of March 2016.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE